IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 31, 2002

## TENNESSEE DEPARTMENT OF CHILDREN'S SERVICES
### v. C. M. S., ET AL.

**Appeal from the Juvenile Court for Maury County**
**No. 42-097     George L. Lovell, Judge**

---

**No. M2001-02893-COA-R3-JV - Filed September 26, 2002**

---

This case involves the termination of parental rights of the mother of two children, both of whom were born while the mother was a minor. At the time of the hearing the son was almost five and the daughter was almost three, and they have been in state custody since they were one year old and three months old, respectively. The trial court terminated the mother's parental rights because of the persistence of conditions which prevent the safe return of the children to the mother and because there was little likelihood the conditions would be remedied at an early date to allow a safe return in the near future. We affirm that decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM C. KOCH, JR., J., joined.

Larry Samuel Patterson, Jr., Columbia, Tennessee, for the appellant, C.M.S.

Paul G. Summers, Attorney General and Reporter; Elizabeth C. Driver, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

### OPINION

This case comes before us on an appeal from an order of the juvenile court terminating the parental rights of the mother involved in this litigation. The mother ("Mother"), appeals the termination of her parental rights with respect to her two children, N.A.S. and L.M.S.[1]

---

[1]DCS also filed for termination of the parental rights of the two putative fathers. The fathers' rights were terminated, and neither has appealed.

Mother was only fifteen (15) years old when her son, N.A.S., was born on January 29, 1997. She and her son lived with her mother. N.A.S. was removed from this home on January 28, 1998, the day before his first birthday, because the home was raided and marijuana and cocaine were found on the premises. Mother's mother was present the night the house was raided, and Mother testified that she and her mother had used marijuana together until their house was raided.

N.A.S.'s removal was initiated by a petition by a law enforcement officer who participated in the raid on Mother's mother's apartment. The petition alleges that the child was found in the residence "where officers noted a strong smell of marijuana and marijuana smoke." The officer believed that, due to the child's age, this situation was hazardous to his health. He also alleged that Mother neglected to provide a safe environment for the child. Based upon this petition, the court found N.A.S. to be dependent and neglected, and placed temporary legal custody with DCS.

Mother was also placed in state custody because she was underage. N.A.S. and mother were not placed in the same home at first. Instead, mother was sent to a facility in Memphis where she lived for approximately two months. Later, N.A.S.'s paternal grandmother, P.P., gained physical custody of both Mother and N.A.S. Mother became pregnant while living with P.P.[2] In June of 1998, P.P. called the case worker at DCS assigned to the case and requested that Mother be moved to a foster home because of some disagreements that she and Mother were having.[3] Mother requested that N.A.S. be moved with her. The case worker placed both Mother and N.A.S. with a foster couple. The staffing summary completed during this placement stated "All in attendance agree that [N.A.S.]'s best interest will be served for him to remain in foster care where he can [have] close contact with his mother while she works on her issues." DCS continued to attempt placements that would further this goal, but Mother's conduct sometimes interfered.

Mother, pregnant with her second child, continued to use marijuana. She and N.A.S. only lived with this first foster family for approximately two months because mother failed a drug test by testing positive for marijuana. As a result, in August of 1998 DCS moved Mother and N.A.S. to different foster homes. While living in the second foster home and pregnant, Mother failed another drug screen. DCS placed Mother in a mental health facility for the last four months of her pregnancy. Her second child, L.M.S., a daughter, was born on January 7, 1999. Mother signed the documents required to surrender L.M.S. for adoption, but revoked the surrender before it was final. L.M.S. was placed in temporary custody of the State on March 1, 1999, as a result of the Department having custody of Mother and because Mother had no visible means of support.

---

[2] The putative father was not P.P.'s son, who was the putative father of N.A.S.

[3] In a temporary custody petition, the grandmother alleged the disruption occurred because she found drug paraphernalia in Mother's laundry. She asked that DCS find another placement for Mother, but wanted to retain custody of N.A.S. At the hearing herein, the grandmother testified that the placement did not work out because Mother was unruly at times and wild. Mother admitted the placement did not work because she was being disobedient and was resentful of the grandmother's attempts to get her to be more responsible.

Mother and her two children were placed in a foster home together. In March of 1999, approximately three months after Mother began living in this her third foster home, Mother failed another drug screen, and DCS informed Mother that she was going to have to attend a drug rehabilitation program. Because she did not want to be sent to the rehabilitation program, Mother ran away, leaving both of her children in foster care. In April of 1999 both children were placed with a new foster family, where they still reside. At this time N.A.S. was two years old and L.M.S. was three months old.

Shortly after her eighteenth birthday, which was May 30, 1999, Mother contacted her case manager to attempt to establish visitation with her children. Visitation was arranged; at first it was supervised and for one hour per week. In addition, DCS and Mother worked out a permanency plan requiring that she obtain employment and maintain a suitable home for the children. Although no copy of this plan appears in the record before us,[4] we gather from the testimony that the purpose of the plan was to reunite Mother and her children if she were able to demonstrate the ability to provide a stable and suitable home environment. Mother testified that she had signed the plan of care and that the requirements in the plan were reasonable and related to remedying the conditions that brought her children into state custody. She testified that she knew that in order to get custody of her children she needed to keep a stable job, maintain a place where she could live with her children, and maintain regular visitation.

In an attempt to meet these goals, Mother rented a trailer, where she lived for approximately seven months. She was then able to move into a subsidized apartment. During this time Mother also attempted to maintain employment. Mother testified that five months was the longest that she had held any one job, but that she was never unemployed for more than one month. Mother testified that she would sometimes get fired from a job because she was "doing something out the night before and would be sleepy and not want to get up" to go to work. She admitted, "That was one of my main problems. I didn't keep a stable job." Mother was fairly consistent with her visitation, especially with N.A.S. and, eventually, got overnight visits with N.A.S. However, she frequently missed visitation with L.M.S. and never obtained overnight visits with L.M.S. For several months Mother paid $245 in child support per month.

Mother lived on her own from around May of 1999 until March of 2001. At some point during this time, Mother was arrested and convicted for theft under $500 because she stole clothes from a mall.[5] Mother was given probation for her theft crime. However, she violated the probation by driving under the influence of alcohol. As a result of her DUI conviction, her probation was revoked, and she was required to serve six months in jail. She was incarcerated March 26, 2001 and was released on September 23, 2001. While in jail, Mother could not comply with the plan of care

_____

[4]Although DCS alleged in its petition that Mother had failed to follow the Permanency Plan, such failure was not a ground for termination in this case.

[5]The record is not clear as to the date of the arrest or conviction.

because she did not have visitation, was not living on her own, was not employed and did not pay child support.

When she missed visitation because of her incarceration, Mother was forced to tell DCS about that incarceration, although the record does not tell us when DCS was notified. Approximately two months after Mother began her six month jail sentence, DCS filed the underlying petition to terminate her parental rights. After her September 2001 release from jail, Mother was incarcerated for another two weeks in October on conviction of or related to charges of[6] driving on a revoked license. Mother owes approximately $1,000 in fines that she must pay before she can obtain another driver's license, which she estimates will take her a couple of months. At the time of the hearing herein, she had criminal impersonation charges pending against her which had not been resolved.

The hearing on the termination petition was held November 15, 2001. Since being released from jail, Mother had been living with her mother and not on her own. Mother, who was twenty at the time, admits to drinking on at least one occasion since her release. At the time of the hearing Mother had been employed for one week by Quick Sak.

At the time of the hearing, Mother was still on probation and, therefore, was being drug tested. Mother had not failed a drug screen in the three months prior to the hearing and stated that she had not used drugs for about eight months. Although Mother testified she had never undergone any drug treatment, it is unclear whether her stays at various facilities had included counseling related to drug abuse.

Mother left school in the ninth grade and has not gotten a GED. She testified that she was preparing to attend classes for a GED at the time of the hearing. Mother is not in counseling because she feels that she does not need any counseling. Neither of the children's fathers have ever established paternity.

L.M.S. has been in state custody her entire life. She was, at the time of the hearing, almost three years old. L.M.S. has breathing problems, but Mother does not know what they are, or what the condition is called. N.A.S. has been in state custody and foster care since his first birthday. He was almost five years old at the time of the hearing. He suffers from emotional problems. Both children have been in the care of the same foster parents since spring of 1999.

DCS filed a petition to terminate the parental rights of Mother as to both children, alleging that the parental rights should be terminated because, among other things, the conditions that had led to the children's removal from the parents, or similar conditions, persisted pursuant to Tenn. Code Ann. § 36-1-113(g)(3)(a). The trial court agreed and terminated Mother's parental rights stating:

---

[6]The record is unclear on the details of Mother's two week incarceration. DCS chose to present its case through Mother's testimony, and it is imprecise in some areas.

[Mother has] not had custody of the children for more than six months and there is a persistence in conditions which led to the children being brought into State custody which prevent the children's safe return to the parents. These conditions still persist. [N.A.S.] and [L.M.S.] were taken into State custody when [Mother's] house was raided for drugs. She was in State custody for several years, was in some counseling but when the State attempted to provide services for drug rehabilitation, [Mother] ran from State custody, escaped, left and was gone until she turned eighteen (18). At that time she said, "I want to see my children," and the State at that time, did make some effort to get this plan of care done, to get [Mother] visiting with the children, which she did for a time. But the same conditions still persist. She does not have a stable job or any kind of stable home life. She is still violating the law and has been incarcerated, was on probation, violated that probation and since that time has gotten new charges. The statute talks about the likelihood that these conditions would be remedied at an early date so that the child could be reintegrated into its family and that would be a permanent situation. . . . [Mother] has been legally an adult for almost two and a half years, since May 23, 1999. How long does a parent need to get themselves established and to show that they can be a parent to a child? And the other side of the question is how long should a child remain in limbo and be subject to being bounced back and forth from foster home to parents' home and perhaps back to foster care?

With regard to the best interests of the children the trial court stated:

[T]he Defendants have failed to make such an adjustment of circumstances, conduct, or conditions as to make it in the children's best interest to return to their home in the foreseeable future . . . . The Court must also consider the effect of a change of caretakers and physical environments is likely to have on the children's emotional, psychological and medical condition; . . . that the physical environment of the parent's or guardian's home is not healthy and safe, there is suspected criminal activity in the home and such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the children in a safe and stable manner; the parent's or guardian's mental and/or emotional status would be detrimental to the children or prevent the parent or guardian from effectively providing safe and stable care and supervision for the children . . . .

Having found that grounds for termination were proved by clear and convincing evidence and that it was in the best interests of the children to terminate Mother's parental rights, the trial court entered judgment terminating Mother's rights. Mother appeals that ruling to this court arguing that the State did not prove by clear and convincing evidence statutory grounds for termination.

I.  Standard for Termination of Parental Rights

A parent has a fundamental right to the care, custody and control of his or her child.  *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 1212-13 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996); *In Re Adoption of a Female Child*, 896 S.W.2d 546, 547 (Tenn. 1995); *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994). This right is a fundamental but not absolute right, and the state may interfere with parental rights if there is a compelling state interest. *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388 (1982); *Nash-Putnam*, 921 S.W.2d at 174-75.

Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger, "severing forever all legal rights and obligations of the parent." Tenn. Code Ann. § 36-1-113(*l*)(1).  This most drastic interference with a parent's rights requires "the opportunity for an individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Because the decision to terminate parental rights affects fundamental constitutional rights, courts apply a higher standard of proof when adjudicating termination cases.  *In re M.W.A.*,980 S.W.2d 620, 622 (Tenn. Ct. App. 1998); *O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn. Ct. App. 1995).  To justify the termination of parental rights, the grounds for termination must be established by clear and convincing evidence. Tenn. Code. Ann. § 36-1-113(c)(1); *In re M.W.A.*, 980 S.W.2d at 622; *State Dep't of Human Servs. v. Defriece*, 937 S.W.2d 954, 960 (Tenn. Ct. App. 1996).  "This heightened standard . . . serves to prevent the unwarranted termination or interference with the biological parents' rights to their children." *In re M.W.A.*, 980 S.W.2d at 622.

This court has explained that standard:

[A]lthough it does not require as much certainty as the "beyond a reasonable doubt" standard the "clear and convincing evidence" standard is more exacting than the "preponderance of the evidence" standard.  *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995); *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn. Ct. App. 1992).  In order to be clear and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence.  *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992); *O'Daniel v. Messier*, 905 S.W.2d at 188.  Such evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established.  *O'Daniel v. Messier*, 905 S.W.2d at 188; *Wiltcher v. Bradley*, 708 S.W.2d 407, 411 (Tenn. Ct. App. 1985).  In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not.  *Lettner v. Plummer*, 559 S.W.2d 785, 787 (Tenn. 1977); *Goldsmith v. Roberts*, 622 S.W.2d 438, 441 (Tenn. Ct. App. 1981); *Brandon v. Wright*, 838 S.W.2d at 536.

*In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000).

Parental rights may be terminated in only a limited number of statutorily defined circumstances. *In re M.W.A.*, 980 S.W.2d at 622. Before termination, one or more of the asserted statutory grounds must be proved by clear and convincing evidence. After the court, applying the appropriate evidentiary standard, determines that the statutory criteria for termination have been met, the court additionally must find, also using the clear and convincing evidence standard, that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2).

## II. Grounds

In the present case, the trial court terminated Mother's parental rights pursuant to the provisions of Tenn. Code Ann. §36-1-113(g)(3)(A).[7] This statute lists as one of the grounds for termination:

(3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent, still persist;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

These grounds must be interpreted and applied in accordance with the express legislative intent of our statutory system of child removal, foster care, and adoption. One of the stated purposes of these statutes is "to protect [children] from needless prolonged placement in foster care and the uncertainty it provides, and to provide them a reasonable assurance that, if an early return to the care of their parents is not possible, they will be placed in a permanent home at an early date." Tenn. Code Ann. § 37-2-401(a). Our courts have recognized the significance of permanency as the goal of decisions involving future placement of children and termination of parental rights. *See, e.g.,*

---

[7]Mother requested that the final order be amended to reflect that the only ground for termination was Tenn. Code Ann. §36-1-113(g)(3)(A), stating in her motion that the trial court had required DCS to specify which ground it was proceeding on and that DCS had chosen this ground. The court amended the order to reflect that Mother's rights were terminated on the basis of that statutory provision.

*State Dep't of Human Servs.v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990) (holding that the consequence of denying termination of parental rights of parents who were unfit due to mental illness would be "to condemn a child . . . to a life in serial foster homes without any possibility of a stable, permanent home").

There is no dispute that the children have been removed from the mother for six months. The issue before us, therefore, is whether the other statutorily required factors were proved by clear and convincing evidence. DCS argues that the court can consider any conditions which would cause a child to be subjected to further abuse or neglect and is not limited to the conditions which were the basis of the initial removal. Based on the clear language of the statute, we agree.

The children were placed in State custody and have remained there because Mother was unable to provide a safe and stable environment for them. Mother herself was a minor for much of the time her children were in State custody, and apparently DCS was willing to give her the opportunity to demonstrate that she could responsibly care for her children after she turned eighteen. DCS initiated visitation and established a plan for Mother to follow in order to gain custody of her children. During the two years between that event and the filing of the petition herein, Mother failed to establish a secure environment for the children or to demonstrate she could provide the care needed by them. At the hearing, Mother admitted she had not complied with the plan of care designed to eliminate existing conditions that made return of the children to her custody impossible. Safe return of the children to Mother's custody was not possible. When the petition was filed, and even when the hearing was held, there was little likelihood a safe return could be accomplished in the near future. When asked, Mother could not provide any estimation of how long it would be before she would be able to care for her children.

During these same two years (two and a half years by the time of the hearing) the two children were living together in the same foster home. They developed strong bonds with each other and with their foster parents who have indicated a desire to adopt the children. The children have had the benefit of a safe and stable environment, but not with Mother or due to her efforts. The children were almost five and almost three at the time of the hearing. Continuing Mother's parental rights would greatly diminish the children's chances of early integration into a safe, stable and permanent home.

On appeal, Mother argues that proof of grounds was not shown by clear and convincing evidence. Her argument is that she was making efforts to improve her situation and to comply with the requirements for gaining custody of her children prior to her incarceration. She argues that the underlying offenses which resulted in that incarceration were not so serious as to justify termination or to show a pattern of criminal activity similar to that which led to the initial removal of NAS from the home. That is not the issue. It is not the seriousness of the offenses that determine whether grounds were proved; it is Mother's inability to do those things necessary to provide a safe and stable environment for her children.

Mother was given probation for the theft offense, but was unable to comply with the requirements of that probation and was convicted of driving under the influence while she was still under the legal age for alcohol consumption. She later had additional criminal charges placed against her. Her inability to conform her conduct to the law, and her inability to comply with probation conditions, are simply further examples of her inability to do those things necessary to demonstrate she can provide her children with the care and stability they need.

We affirm the trial court's finding that clear and convincing evidence demonstrated that conditions persisted which prevented the return of the children to Mother's custody, that there was little likelihood that those conditions would be remedied in the near future, and that continuation of the relationship between Mother and her two children would diminish the chances of the children's integration into a safe, stable and permanent home.

### III. Best Interest of the Children

Mother's position at the hearing was that she should have another chance. Giving Mother "another chance" would, of course, mean that the children would remain in foster care indefinitely and remain unavailable for adoption until Mother was able to demonstrate she could care for them or until Mother's parental rights were eventually terminated. Mother could not say how long the children should remain in this status while she attempted to do better.[8]

We understand Mother's desire to be given yet another opportunity and also understand the degree of responsibility she was asked to demonstrate at a relatively young age. However, those responsibilities arose from the needs of her children, and our concern must be the best interests of the two children involved. Tenn. Code Ann. § 36-1-113(c)(2). Our legislature has listed some, but not all, of the factors a court is required to consider in determining whether termination of parental rights is in the best interest of the child.

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

---

[8]She also stated that if her parental rights were terminated, she preferred that P.P. be allowed to adopt N.A.S., thereby separating the children. Although she acknowledged this separation would be difficult for the children, she thought it more important that at least one of them be raised with his biological family. The guardian ad litem felt that since the children had been together since the daughter's birth and were very close, " It would not be fair to either of these children to separate them so that one could be placed with a relative." The issue of adoption or other placement of these children is not before this court. Our sole issue is the termination of Mother's parental rights.

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward other children in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

The children were appointed a guardian ad litem for these proceedings, and the guardian filed a report detailing her investigation into the situation. She concluded that, in her opinion, termination was in the children's best interest, stating:

These children have been in foster care for approximately two years. Because their mother has not tried to comply with the plan of care, it appears that they will be in foster care for several more years. The children have bonded with their foster parents and the foster parents are anxious to adopt them.

Our review of the evidence presented at the hearing in light of the factors set out above compels our agreement with the lower court that the best interests of these children would be served by the termination of Mother's parental rights. As explained earlier, Mother has not made an

adjustment of circumstance so as to make it safe for her children to be in her home. She has not demonstrated an ability to provide the children with the care they need.

While Mother maintained fairly regular visitation with N.A.S., her visitation with L.M.S. was less regular. While incarcerated Mother did not see her children. After her release from jail, Mother saw her children only twice. Mother also admits that she maintained her visitation with N.A.S. more than with L.M.S., but blames this on car trouble, the foster parents and L.M.S.'s health problems.

Both children have lived with foster parents longer than they lived with Mother. N.A.S. was removed from Mother's custody on his first birthday; although he and Mother shared some foster care placements, they were separated sometimes due to Mother's actions. L.M.S. was placed in state custody shortly after her birth. Mother lived with L.M.S. and N.A.S. for only two to three months after L.M.S.'s birth. Then, she ran away and left her children. For approximately two and half years thereafter, until the date of the hearing, L.M.S. and N.A.S. have lived with their current foster parents. While Mother enjoyed visitation during most of this time, it is clear that the children have spent most of their young lives with their foster parents. The foster parents are the only parents that L.M.S. knows. Mother admits that she has a stronger bond with N.A.S., but the children have a strong bond with each other. Thus, while we cannot say that no meaningful relationship has been established between Mother and the children, it is clear that these children have formed a stronger bond with their foster parents and have found their only stable environment with them. This is not a situation where children were raised and cared for by their biological parents for a number of years before they were removed from the parents' custody.

These children need stability in their lives and Mother cannot provide that to her children. Mother has been an adult for two years and in that time has been unable to demonstrate an ability to provide the care her children need. The General Assembly has made the policy decision that children in such situations need not remain in limbo indefinitely. Therefore, we find that the termination of Mother's parental rights is in the best interest of the children.

## IV. Conclusion

We affirm the order terminating the mother's parental rights and remand the case to the trial court for such further proceedings as may be required. Costs of this appeal are taxed to Mother, the appellant, for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE